Good morning, Your Honors. Stephen D. West, appearing for Appellant Ernest D. Craighead, and I'll tell the Court I haven't been here before and I'm pleased to appear in front of you. The way I sum this case up, I think, is there's two issues that we preserved for appeal on the conditional plea that we took, and of course it's the Franks issue and the Miranda issue. The way I look at Franks, there's one really essential question that has to be answered here, and that's how can they download a file from my client's computer that they can't find two weeks later? And then I think in the Miranda issue, I think the... It isn't a question on Franks, though, Counsel. Don't you have to show that there was a knowing and intentional false statement on the part of the special agent? Not just merely a mistake, but you have to show that somebody intentionally lied to the Court. Do you have any evidence of that? I don't think that's the standard. I think I have to show that there was a reckless disregard for the truth, and I think I can demonstrate that. Because the FBI, on two hands, has got contradictory positions. On the one hand, they are telling Congress that, look, there's a real serious problem out here with Internet thefts, this IP spoofing that my expert has suggested to the courts that is taking place here. They have all this information that they are putting out to the public, dangers, warnings, signs saying, hey, look out because this is a real problem. And what IP spoofing is, is basically people out there who are very sophisticated with computers and have ill will towards other members of the public are going out there and adopting somebody else's identity. This is all real nice in theory. What was the FBI supposed to do? They were supposed to discount that anybody else, that there was identity theft going on? How could they possibly have verified that? Well, I think that there are means for them to verify that. They can make contact with the subject that they're investigating. That's a traditional method of investigation. It's not something that is novel in this particular case. The agent could have gone into a chat room and talked to my client. Initially, they had the ability to do that, and we were able to demonstrate that it's basically two clicks and a mouse, and you can approach that person on the P2P program that they were using. I know that you had an expert witness. Did she come up with any evidence to show that there was any kind of IP spoofing going on here? She did not. Are we just talking about theoretical possibilities? If you send me an email, it's possible that it's spam, but do we have any evidence whatsoever that somebody else was using this website? I don't think we have any evidence of that. Again, I repeat the question. How is the FBI supposed to discount that possibility? They've traced this Internet porn. They've traced it to your client's IP address. They've gone out. They've confirmed the address. They've confirmed through Cox billing. They've jumped through all of these hoops. Now, how do you eliminate the possibility that somebody else on the planet is spoofing that IP address? It's pretty sophisticated stuff, and how could the FBI possibly discount? How can they possibly prove the negative? Well, I think that's a real concern here, and the problem is that what happens is the agent does nothing more than just go on the computer. She's making cold calls, essentially, out into the Internet, and she goes into a program where a myriad of people are able to get into there and communicate with others. Sure, but your client had an IP address that was verified through the carrier. She didn't just say, I've got an IP address, and now I can trace this and we're going to go. She took additional steps to verify who owned the IP address. There's no question that she did it. I think that was a valid investigation. The problem, again, goes back to particularizing this IP address and or the communication that she says that she's downloading to my client. I mean, their theory is that when their expert, Agent Paul, and my expert both went into the computer on their hard drive and tried to find this pornography that they claimed was downloaded from my client's computer, their theory is so remote in terms of possibilities. I mean, you're talking a number of steps. You're talking about, first, that the file existed, second, that it was deleted, and then it was put into a trash bin, and then randomly, randomly selected eight of the nine sites that she indicated she believed were on his computer, randomly selected those to push out of his computer. The problem is, is that the government itself, the FBI, tells the citizenship that, look, what the IP spoofers are doing is they're taking your identity or somebody's trustworthy identity and making it appear to be somebody else so that when you go to investigate, that is... So are you suggesting that every time that a search affidavit is prepared, that they have to say that we're telling for a computer using an IP address, they have to disclose the possibility of generic spoofing or else it's defective? I don't think that that is in and of itself. I think it's part of the cumulative effect of the lack of probable cause in the affidavit because it's one factor that a magistrate isn't going to know off the top of their head. I mean, I would suggest, I mean, I haven't even heard of this stuff until I got involved with this case. Now, I'm not very computer literate, and I would suggest that a lot of... Isn't that the typical defense that's raised in almost every case? A hacker got in, somebody's spoofing my ID. You know, the district court did mention that at one point in time. It started to go off on a tangent, but, you know, with respect to somebody else putting this on my client's computer, that's not the point here. We're going to a shared program to go retrieve files. That shared program, the LimeWire itself, is a location where other people are always there, and the IP spoofers... It's a file sharing program, so it's not a centralized system, right? It's unlike the architecture of Napster, the original Napster, right? Again, I don't even know what that is, so I'm not computer literate. You better get to your Miranda argument. I think your time is running out. Thank you, sir. I think that under the circumstances of the nature in which my client was approached coming to his house at early morning hours, the fact that there were several armed people that intruded in his home, the surprise that this was taking place, his being a novice, never having been involved in the system, the fact that his belief in his statements, he's never at any time was told that he was free to leave. When you look at the... The district court's found against you on that one, counsel. Is the district court's finding clearly erroneous? Your client said, I don't ever recall being told that I was free to leave. Special agent said, I told him that he was free to leave. And the district court specifically finds the agent credible on that point. Are you arguing that that point is clearly erroneous? I would have to say so. And not so much that the words themselves were not uttered, but were they uttered in a time and circumstance under which any reasonable person would be able to assimilate what was being told to them at that time. She told him at the door, when all this activity is coming in, that you're free to leave. I would strongly suggest to the court that nobody, no reasonable person at that point in time, believes they're free to leave when they have all these law enforcement officers. That's a different point, counsel. I think that's a much more effective point. Do you really want to argue that the agent didn't tell your client that he was free to leave? I don't believe that's what I said. Okay. So you don't wish to argue that the district court's finding was clearly erroneous? You know, I guess my point is that, you know, does this person who's being told this understand what's being said? And so that the overwhelming circumstance is being taken into a spare room, a room that is not lived in. It's just storage. The agent had no place to sit. My client had no place. He's standing. There's literally a guard at the door. Are these circumstances that a reasonable person would believe they're free to leave their room? And I don't believe that's the case. Counsel, we have a couple of pictures in the record of the storage room. Yes, sir. And I want to make sure I understand this, though. We have the special agent there. We have a member of the sheriff's department, and he is armed. Is she armed? Yes, sir. She's armed. Okay. She's seated Indian-style on the floor. Is that correct? So she's not standing or in any kind of ‑‑ it can be particularly threatening if she's seated cross-legged on the floor. But the sheriff is standing at the door. Is that correct? And is your client seated or is he standing? He's standing basically in the middle of the room between the two. Okay. But he's answering questions to somebody who's seated on the floor? That's the position she took. Let me try to get a practical handle on this. What are you actually looking for? Let's assume hypothetically that you lose on the Frank issue, but you were to be successful on the custodial interrogation issue. You would want then to have a trial, I guess, correct? Well, we would certainly want to ‑‑ Now, he was sentenced to 78 months. I just wonder, as a practical matter, is there a substantial risk that if you do succeed in that respect that he could wind up worse than he is at the present time? Well, that's certainly something we would have to consider at that point in time. All right, counsel, thank you for your argument. Good morning. May it please the Court, Celeste Corlett, Assistant United States Attorney here on behalf of the United States. What would your position be? I'm concerned specifically on the interrogation issue here, not that I'm not concerned about everything in the case, but if, in fact, the judge did not make that finding that the agent's testimony was credible, that he was told he's free to leave,  First, the government's position is that this was not the case. This was not a custodial interrogation. The Court was correct in finding that this was not custodial and the Miranda was not required. So you're asking me if you find this was a custodial interrogation? Let's assume that to be the case and everything hinges on whether or not this person was free to leave. Would it change your position if I were to say contrary-wise that I don't think that that information was imparted to him, that he was not free to leave, or he was not told he was free to leave, I should say? Well, the standard is whether or not the defendant was in custody. And there are several other factors also that support the defendant was in custody. So the answer is no, it would make no difference whether he was told he was free to leave or not? I think that it's one of the factors that he was told to leave, but that's not the sole factor. The test is whether or not... They have a bunch of armed people. He's in a storage room, which is 15 by 15. I also, as Judge Barbee has done, was curious to look at the storage room. It looks like a pretty intimidating environment, especially with the sheriff standing at the door, and he's armed. How do you say that this is not custodial interrogation under those circumstances? Well, I think the court clearly did not err in its factual findings that, first of all, you look at that situation. The defendant is in his home. He's not in a police station. He's not in the back of a squad car. The defendant was asked and agreed to go to a back room for privacy, and that's why they went to that back room. And, again, it's in his home. It is a room that's filled with storage. It's all of his boxes. And as you had rightly pointed out, the agent who's asking the questions, the court specifically said that her demeanor was important to the court's decision here because she's 5'5", an average build. The defendant is much larger than her. She's sitting on the ground or squatting. He's what, he's like 5'8"? Pardon me? I think he's like 5'8", isn't he? I believe that was the other officer in the room. He was 5'8". I believe the defendant was approximately 6'0", but significantly taller than the agent who was interviewing him. She also had a... You have an officer there in the room with him. You have another officer at the door with a gun blocking the entrance, right? You have seven other officers with weapons on the outside. He testified he didn't feel free to leave, and I think under those circumstances it's kind of hard to believe that he felt that he could just simply get up and walk out. Your Honor, the test is an objective test. It's whether a reasonable, innocent person would have felt that they were in custody, not the defendant's subjective thoughts. No, I understand.  The agents did have their guns, but they did not have them drawn. They were drawn at some point, though, right? They were drawn earlier. At the very beginning, the agents who were clearing the room had drawn their guns. Right. They come in, they draw the guns, they say, let's go to a private place. Then the guns are holstered. One officer stands at the door blocking or guarding the entrance. The other is talking to him, who is doing the interrogation. Your Honor, I would disagree with the description of the other officer was guarding the door. What was he doing? He was standing in basically the only room in the area that was available to stand in. As you saw in those pictures, there was objects all around the room. He wasn't searching, right? No. He wasn't conducting the search. What was he doing? The agent testified, Agent Andrews testified, that he was there basically for safety concerns, for her safety concerns, that she was not going to go in a room by herself with an individual who is very much larger than her. And as you said, she has a gun, and you wouldn't want her to be overpowered and have that gun taken away from her by this individual, and she's back there in a room by herself. And he never even spoke. Neither of them even touched the defendant, let alone used any force against him. He was not in handcuffs. There was no promises made. As the judge indicated earlier, the district court resolved the conflict in testimony and said that he did find the agent credible, that she had told him that he was free to leave at any time. He heard the testimony of both the agent and of the defendant. He was able to judge their credibility, and he found the agent credible. Additionally, the ---- So are you saying that if the agent said you're free to leave, that that's the end of it, and automatically we should find that there's no custodial interrogation here contrary to ---- No, I think it's the totality of the circumstances and that's ---- You are the totality of the circumstances. The totality of the circumstances don't seem to support your argument here. As my colleagues point out, the totality of the circumstances seem to tip the other way, and everything seems to hang on the fact that he was told he's free to leave. Isn't that your position? No, I think that it's the totality of the circumstances that he was ---- He even admitted that they said he was ---- that it was voluntary for him to speak. He agreed to go to the back room with them. He agreed to speak with them. These are not circumstances of an individual who has his will overborne or ---- When was he told he was free to leave, right away or after he came into the storage room? The agent recalled that she always tells them once they are in the room that they are free to leave. In the storage room? In the other bedroom that had storage. That's correct. That's when he ---- not right away. When the agents barged in and hosted their weapons, did a sweep, he was not told at that time, oh, by the way, you know, you're free to leave now. You don't have to stay. I believe the agent's testimony was that she thought she told him twice at the very beginning and also in the room, but she definitely knew that she told him while they were in the room. In the storage room. He was free to leave. That's correct. Are you familiar with the United States v. Lee? No, I'm sorry, Your Honor. I should have issued an order citing that to you because I don't think I saw it in the briefs. But in that case, the agents told the ---- it's a Ninth Circuit case. The agents told the defendant that he was free to leave in similar circumstances, that he was free, asked him if he wanted to be interviewed. They put him in the squad car. And that interrogation was held to be custodial even with the statement that he was free to leave, acknowledged, and with the invitation to make a voluntary statement in the squad car. So how is this any different? Well, Your Honor, I think it is a significant difference that they're in the squad car versus in the house. And I don't think the squad car by itself would mean that they're in custody. But I do think that the difference of being in your own home, agreeing to go to a bedroom in your home where you have storage, and being told that you are free to leave and that this was a voluntary discussion. Why didn't they just give him a Miranda warning? At that point, the agent even said that they didn't have the computer yet. They didn't have the evidence and what ---- What harm could there have been? They were not required to give him a Miranda warning just because ---- Well, that's what we're going to decide is whether they were or they weren't, isn't it? That's kind of the ultimate question. Well, Your Honor, they were not placing him under arrest, and so they were not required to ---- they didn't have him in custody. They weren't required to read him his Miranda. But you can overgive the Miranda warning. That is, you could give it in circumstances in which you were not obligated to, and it certainly would have hedged their bets, wouldn't it? Hedged their bets? It might have made them feel more comfortable about interrogating him in a 15-by-15 room with an armed officer standing blocking the door. Well, again, I disagree with the characterization that he was blocking the door. He was standing in the room. He never even spoke. Objectively speaking, I mean, we're looking at it objectively, as you pointed out, when an officer is standing in the doorway, how can we not conclude it's blocking the doorway? Well, because ---- We have to ignore his subjective feelings that he was just there to protect or he was there to do all these things. He didn't say anything. He just stood in the doorway. Well, and Agent Andrews indicated that he was actually leaning on the wall at some points. And as I said, I think it's the totality of the circumstances of all of those factors that came into play, and all of those factors was that he said he knew he was voluntarily speaking to her, and he chose not to stop speaking to her. He knew that ---- She says you're not under arrest, we're not here to arrest you, gives them all assurances as though Miranda isn't required because she all but said we're not going to use the statements against you because you're not under arrest, you want to talk, they talk. She's talking, he's got the door, there are seven other agents outside with weapons. At that point, there's one of his officers, his own military officers present, but hasn't told him why he's there. Well, and the officer ---- What's wrong with giving a Miranda warning? Well, I think that the facts are that the Miranda warnings were not given because they did not ---- he was not in custody. Those weren't the circumstances. Let me explore one other circumstance, if you may. I don't know whether I have this down factually correct. I have a note here that he was interrogated for from 20 to 30 minutes. Is that correct? That's correct. Well, how much time passed by before he fessed up, so to speak? From what the testimony was that she asked him about the computer and he talked about the computer, I don't think that there was any testimony that said specifically during that amount of time when it was that he admitted that the computer was his, that he did download child pornography, and that he did also have it on disk. But objectively, it sounds that there was incessant questioning that went on. I mean, for 20 or 30 minutes, it seems as if, you know, that was ---- there's a constancy factor there that's somewhat troublesome, isn't there? I think 20 to 30 minutes actually is a relatively short amount of time that she was in there talking to him about what happened and what it was, why they were there, and what it was that they were ---- the reason they were trying ---- they had the search warrant for his computer. That was actually a relative short amount of time. In addition, at the end, they did not arrest him, and that is a factor that goes towards supporting that he was not under custody and that he was free to leave. Well, of course, he can't figure that out in advance. The only thing he can do is rely on her assurances to him that he will not be arrested at the end of this process. The fact that he's not, in fact, arrested at the end is of no good to him an hour earlier. But it does support the fact that she had said that he was free to leave, that they were not going to arrest him that day, regardless of what he said, and, in fact, he was not arrested. Well, isn't this all just gauged to lower his defenses, in other words, to make him talk? He's assured you're not going to be arrested today, no matter what you say. And then there's no advisement that anything he said will be used against, could be used against him later or that he had a right to remain silent or any of those things. She's saying we're not going to arrest you today, no matter what you say. Let's go in the storage room. All exits are sealed, armed guards around. Well, again, I would disagree with the description that all exits were sealed. I think the door was closed for their privacy and so that they wouldn't be distracted by the other officers searching the home. That was the only exit from the room, right? That's correct. And also, at that time, what the agent knew was that child pornography had been downloaded from a computer that was associated to his house, and she was trying to determine whether or not he was the person who had actually downloaded that. And so at that point in time, she didn't have all of the evidence to support that he was, in fact, the suspect and that he should be arrested. And so I think that's important, that that's what she was trying to do was just flesh the investigation. Yeah, she was trying to find out whether he was guilty or not. She was trying to further her investigation and determine what it was he knew about the information on the computer, if anyone else had used that computer, and that was the purpose of her questions. Our questions have taken you over time. Thank you very much for your argument. Thank you, Your Honor. We'll give you one minute for a bundle. Do you want to take it? I guess there's two issues that I kind of thought about, and one was the Court's question regarding whether we would want to win this Miranda motion or not in light of whether you're going to grant the Franks motion. I think the Franks issue is, to me, probably the more troubling of the two issues because we are... It's a pretty high standard for Franks, though. I mean, it's an intentional and willful withholding of information. It's hard to see that in this case. I believe we were at least entitled to a hearing. I think we made a substantial showing in order to entitle ourselves to a hearing because the answer to whether or not she was truly reckless in what she did can only be answered by being able to have her come and testify and cross-examine her with her experience, her knowledge of the spoofing problem. None of that is in the record. And I think we made the initial showing. I'm not suggesting we should have won a Franks hearing at that time. I know, but basically what you would ask her about is this generic notion that spoofing occurs, which is generally accepted, right? That's all you have. You don't have any individualized evidence in this case that there was actually any spoofing at all, do you? It's the only logical, cogent explanation for what took place. The government's explanation is so abstract and so remotely possible, it's not a valid proposition. So if you only have two propositions, one has high probability, one is remotely possible, which is the one that carries the day? And it's the probability of the spoofing is what took place because there's no other explanation as to why these files were not on my client's hard drive. Thank you, counsel. Thank you. The cases here will be submitted. The case of Bowman v. Warchall is submitted on the briefs and will proceed to argument on Whitaker v. McDaniel. Thank you.
judges: Thomas, Bybee, Block